No. 20396.

WALTER E. LARSON, ET AL., v. OSCAR HINDS.
(394 P.2d 129)

Decided July 13, 1964.

Mr. WILLIAM PEHR, Mr. ALLAN R. COOTER, for plaintiffs in error.

Messrs. MASON, REULER & PEEK, for defendant in error.

*In Department.*

Opinion by MR. JUSTICE PRINGLE.

THE parties appear here in reverse order of their appearance in the trial court. We will refer to them as they appeared below or by name.

Plaintiff Hinds instituted this action in unlawful detainer in the Superior Court of the City and County of Denver and alleged in his complaint that he was the owner of certain described premises, to-wit: 4881 Lowell Boulevard; that said premises were leased to the defendants from month to month at a rental of $60.00 per month; that the defendants had failed to pay the said monthly rental; that plaintiff had elected to terminate said tenancy on June 30, 1961; that a demand in writing for the payment of rent due or possession of the premises had been duly served on June 19, 1961; that defendants wrongfully held possession of the premises; and that defendants were indebted to plaintiff in the sum of $960.00 for rent. The prayer of the complaint was for possession of the premises and past rent due.

The defendants' amended answer contained a general denial and an affirmative allegation that they were the owners of the premises in question and that the relationship of mortgagors and mortgagee existed as between them and the plaintiff.

When it became apparent, during the course of trial in the superior court, that the litigation concerned title to property the value of which exceeded the jurisdictional limits of that court, the proceeding was terminated and certified to the district court pursuant to statute. Trial was thereafter had in the district court and judgment entered for the plaintiff for possession of 4881 Lowell Boulevard but denying the plaintiff's

request for damages for rent. From this judgment the defendants sue out writ of error here.

The pertinent facts giving rise to this controversy have their inception in 1955. At that time the following instruments were drawn by the plaintiff's attorney and were executed by the parties:

(1) A warranty deed whereby Jennie Bloomquist, George Larson, Beatrice Larson, Walter Larson and Vernon Larson conveyed 4881 Lowell Boulevard to the plaintiff. The deed recites that the property was free from all encumbrances except a first deed of trust to the Midland Savings and Loan Association.

(2) A promissory note signed by the defendants payable to the plaintiff in the principal amount of $800.00.

(3) An escrow agreement whereby the Larsons and Jennie Bloomquist agreed to pay to the plaintiff the principal amount of the note, together with interest thereon at the rate of 1% per month, within sixty days.

"Schedule A" of this agreement recited the following:

"In the event the parties of the first part fail to perform in accordance with the terms and conditions of this agreement and the note of even date herewith and hereto attached, executed in favor of the party of the second part, The Escrow Holder, upon demand of the party of the second part in writing, and without notice to the parties of the first part, shall immediately deliver the attached warranty deed to the party of the second part; and should such event occur, this transaction shall be deemed a sale of all right, title and interest of the parties of the first part for the amount of said note together with all interest accrued thereon, and the note shall be delivered by the Escrow Holder to the parties of the first part upon the written request of the parties of the part (sic) and each of them."

Each of the above instruments was delivered to The Central Bank & Trust Company as escrow holder.

The record discloses that George Larson had made several overtures to the plaintiff in an attempt to bor-

row $800.00 from him and that the plaintiff refused to lend him the money, presumably because of George's weak financial position.

Plaintiff, according to his testimony, was in the business of lending money for many years and denominated his pursuits as "real estate, factor in accounts receiveable, consulting." After the plaintiff refused George's requests for the loan, George approached the members of his family — his mother Jennie Bloomquist and his brothers and sister — and proposed that they sign the instruments, the nature of which are now in controversy. No rights of any third parties are involved.

Vernon Larson testified that the understanding of the family was that the transaction amounted to a mortgage being placed on 4881 Lowell Boulevard to secure the loan of $800.00 from the plaintiff. The plaintiff's understanding of the transaction is illustrated by the following excerpts from his testimony:

"Q: Now, as I understand also, George Larson borrowed the $800 from you, is that correct?

\* \* \*

"A: In a form, yes. I can't answer that direct because it's hardly correct. It is and it isn't. It wasn't exactly a loan. It was an escrow agreement put up —

"Q: Let me just say it this way. George Larson came to you and wanted to borrow $800. You turned him down for lack of security, is that right?

"A: George Larson came to me several times before I ever would do anything. I kept turning him down but he was so pushed, I came around.

\* \* \*

"Q: All right. But he came to you one more time and you decided to make him a loan, is that right?

"A: I decided to make him a deal under certain conditions.

\* \* \*

"Q: Now then did you buy the property at the time?

"A: It was an escrow agreement of where he could pay off for so many days, as I remember.

\* \* \*

"Q: Now, the deed was put there for the purpose of giving you some security for the note, is that right, for the $800 that you loaned to George?

"A: It would be put up — if he didn't pay, I would have the property. If he did pay, he'd get it back.

"Q: (by Mr. Pehr) For the 60-day period that the note — within which the note was to be paid, the deed was to act as security for the note?

"A: He had the privilege of paying.

"Q: Certainly.

"A: But the escrow was — if it wasn't paid, I was to get the deed. If he paid, he was to get it. Is that what you mean? That's the only way I can answer it.

"Q: Were you buying the property?

"A: Well, how would you know? The way the deal was made, you couldn't say I bought it or loaned on it; it was an escrow agreement.

\* \* \*

"Q: \* \* \* As I understand the arrangement, George Larson, or the Larsons and Bloomquist could pay off the $800 during the 60-day period, is that right, and they would get back the deed?

"A: That is, I believe, according to the agreement — whatever it says, they could do, but at the bank, not to me."

█ It is the true nature of the transaction which concerns us here and if the true nature is that of security, the transaction will be given that effect no matter how many papers may be executed that give to the transaction an appearance other than the true one. The arrangement between the plaintiff and the defendants certainly comes as close to a formal security transaction as could have been accomplished without the execution of a mortgage or deed of trust. See *Reitze v. Humphreys,* 53 Colo. 177, 125 Pac. 518. A deed purporting to be an

absolute conveyance may be proven by extrinsic evidence, either parol or written, to be in effect a mortgage. *Pullara v. Hed,* 121 Colo. 234, 215 P.2d 321; *Jones v. Hazen,* 116 Colo. 462, 181 P.2d 1016; *Oppegard v. Oppegard,* 90 Colo. 483, 10 P.2d 333.

█ Particularly pertinent to the situation before us is the following statement in 9 *Thompson on Real Property,* 1958 Replacement, Sec. 4713, p. 246:

"* * * It is held that a deed deposited in escrow to be delivered to the grantee on failure of the grantor to pay a debt due the grantee is an equitable mortgage. * * *"

█ The fact that the escrow agreement in this case provided that should the defendants default on the note the transaction would be deemed a "sale" is not controlling. The following quotation from *Marshall v. Russell,* 61 Colo. 417, 158 Pac. 141 is pertinent here:

"The fact that the escrow agreement states that in the event of nonpayment, etc., the instrument shall become absolute does not change the rule. It is a familiar and undisputed proposition that no force will be given to a stipulation in a mortgage, or in a deed intended as a mortgage, or in any instrument executed at the same time accompanying such deed by which the mortgagor agrees that, if he fails to make payment by a stated time, the mortgagee shall become the absolute owner of the property.

"The deed when executed, being simply a mortgage for the security of a debt, could not thereafter become anything else, except through the execution of a subsequent agreement based upon a valuable consideration. * * *"

█ It is clear from the testimony by both sides that the defendants borrowed $800.00 from the plaintiff, executed and delivered a note payable to the plaintiff for $800.00 and as part of the same transaction placed in escrow a deed which was not to pass title unless and until they defaulted in their obligation to pay the note.

The only purpose of the escrow was to avoid the necessity of foreclosure and sale in the event of default. The public policy of this state with respect to such transactions is clearly declared in C.R.S. '53, 118-6-17:

"MORTGAGES, NOT A CONVEYANCE BUT A LIEN. — Mortgages, trust deeds *or other instruments* intended to secure the payment of an obligation affecting title to or an interest in real property, shall not be deemed a conveyance, *regardless of its terms,* so as to enable the owner of the obligation secured to recover possession of real property without foreclosure and sale, but the same shall be deemed a lien." (Emphasis supplied.)

The arrangement here deprived the defendants of any redemption rights which the public policy of this state guarantees and amounted to a forefeiture which the policy of this state abhors. The evidence in this case compels the conclusion that under the circumstances here present the arrangement was a security transaction as a matter of law and the court erred in holding the same to be an absolute sale.

The record shows that since the conveyance the plaintiff has paid all the taxes and made the payments on the first deed of trust which had been placed on the premises prior to the conveyance to him. The plaintiff contends that, having permitted him to make these payments, the defendants are now barred from asserting any rights they might have in the property. We do not agree.

The record shows that the defendants here remained in continuous possession of the property after the 1955 transaction and were still in possession when the plaintiff brought his action to oust them in June of 1961. It is true that these defendants did not pay the taxes or make the first mortgage payments during this time, but their evidence shows that this was the obligation of the brother George, who was deceased at the time of the trial, and that they had assumed that he had

carried out his obligation. Defendants also point out that the obligation to repay the note was George's and that they were never advised by anyone that the note was not repaid and that they had no information that plaintiff claimed the title until after George died.

Plaintiff also contends that George paid "rent" on behalf of the defendants and that these payments show that the defendants recognized the plaintiff's claim of ownership. On this point the trial court found that there was no evidence to establish an agreement to pay rent on the part of these defendants. All of plaintiff's dealings were with the brother George, and it is significant that the plaintiff did not bring this action to oust defendants until after the death of George, although plaintiff alleged in his complaint that he had not received rent payments for eleven months prior to the death of George.

Defendants assert that the warranty deed under which the plaintiff claims ownership of the property was never formally introduced into evidence. Our search of the record reveals this to be true but the record also conclusively shows that counsel for both sides and the trial court treated the deed as though it had been formally introduced into evidence and under such circumstances the defendants have waived any objection on that ground. *Underhill v. Detert,* 152 Colo. 223, 381 P.2d 265.

Since the arrangement here amounted to a mortgage it became the duty of the trial court in the exercise of its equity power to resolve and determine all the rights of the parties before it arising out of this transaction. We must apply the familiar maxim that when equity takes cognizance of one branch of a cause it should adjudicate all the rights of the parties to the controversy until complete justice is accomplished. *Reitze v. Humphreys,* supra.

Under the circumstances of this case, the rights of all the parties will be properly protected by treating

plaintiff's claim for relief as an action to foreclose his mortgage and the matter should proceed upon that basis.

Accordingly, the judgment is reversed and the cause remanded to the trial court with directions to enter a decree declaring the warranty deed to the plaintiff to be a mortgage, determining the amount due to the plaintiff by the defendants on the mortgage debt, together with expenditures made by the plaintiff for taxes and upon the first deed of trust and interest thereon, and ordering that the property be sold as in a suit to foreclose a mortgage in order to satisfy the amounts found to be due from the defendants to the plaintiff, reserving to the defendants their statutory period of redemption from said sale.

MR. JUSTICE FRANTZ and MR. JUSTICE HALL concur.